**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION**

|  |  |  |
|---|---|---|
| ARNULFO CANTU, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | Civil Action No. C-05-4 |
| | § | |
| GOODYEAR TIRE & RUBBER CO., | § | |
| | § | |
| Defendant. | § | |

## ORDER ON DISCOVERY OF CERTAIN DOCUMENTS

In this personal injury action, Plaintiff Arnulfo Cantu claims that Defendant Goodyear Tire & Rubber Company designed and manufactured defective tires and that such a defective tire was the proximate cause of Plaintiff's motor vehicle accident and resulting injuries. Pending is Plaintiff's oral motion for access to certain information and documents concerning Defendant's decision to add a nylon overlay to its Load Range D tires and its Load Range E tires. Defendant argues that the information sought is a privileged trade secret and that it has already supplied Plaintiff with sufficient information to prosecute his claims. For the reasons stated herein, the Court grants Plaintiff's request for access to the documents.

## I.   JURISDICTION

This Court has diversity jurisdiction, 28 U.S.C. § 1332(a)(1).

## II.   BACKGROUND FACTS AND PROCEEDINGS

On August 5, 2003 Plaintiff was driving a 2002 Ford pickup

truck equipped with Wrangler AT/S LT 285/75R16 D tires which are a type of tire classified as "Load Range D" (LR-D).  See D.E. 1. Plaintiff claims that his left-rear tire (the "Wrangler LR-D tire") suddenly failed when the tread detached from the body of the tire and wrapped around the truck's axle, causing the vehicle to lose control and roll over.  Plaintiff  suffered injuries as a result of the accident.

Plaintiff filed suit on January 5, 2005, claiming that the accident was caused by Defendant's negligence in designing and manufacturing the LR-D tire and that "safer alternative designs were economically and technologically feasible at the time the product left Goodyear."  In particular, plaintiff argues that Defendant failed to manufacture the LR-D tire with an additional feature known as a "nylon cap ply" or "nylon overlay".[1]

**Discovery dispute.**

Plaintiff seeks discovery of all documents related to Goodyear's decision to implement nylon overlays on all of its LR-D tires. Related to that inquiry is information concerning when Defendant decided to add a nylon overlay to another of its light truck tires known as "Load Range E" (LR-E).  Defendant decided to add a nylon overlay to its LR-E tires in 1998.  It did not decide

---

[1] A nylon overlay is a tire component that acts as "restrictor belt," clamping down the tire's crown area and making it more resistant to tread/belt detachments.  (Richard Olsen Depo. ("RO1") at 34-5.)

to add a nylon overlay to its LR-D tires until 2001-02. Plaintiff's Wrangler LR-D tire did not have the nylon overlay.

Plaintiff argues that the design and specifications of the LR-E tires are sufficiently similar to the LR-D tires, including the Wrangler LR-D tire at issue, that it needs information relating to both types of tires. Defendant maintains that the information constitutes a protected trade secret.

Hearings were held on September 2 and 15, 2005, and the documents at issue were submitted for *in camera* review. At the hearings, Defendant testified that it monitors the performance of its LR-D and LR-E tires on the road. (In-Court Test. of Richard Olsen ("RO2")at 12:14:38.) There are several types of information to determine a tire's performance and failure rate. One such type of information is known as "adjustment data." (<u>See</u>, <u>e.g.</u>, Terrence Parsons Depo. ("TP") at 27-8, 52-3, 67; <u>see also</u> Beale Robinson Depo. in <u>Frankl</u> case ("BR2") at 16.) The term "adjustment" refers to situations where a consumer returns a tire to a retailer complaining of a problem. (RO2 at 11:00:45.) If the retailer gives the consumer a replacement tire, or a discount on the purchase of a replacement tire, that is an adjustment. (BR2 at 18; RO2 at 11:00:45). When making an adjustment, the retailer records a code indicating the alleged problem with the tire. (BR2 at 18-9; RO2 at 11:01:20.) Defendant collects the information on the number of tires adjusted as well as the codes indicating the alleged

problems.  (<u>See</u> BR2 at 18-9.)  An increase in adjustments generally indicates an increase in actual problems with a tire on the roadway. (TP at 48-9.)

Defendant also collects information on the number of damage and liability claims brought against Goodyear alleging tire failure. (Stroble Affidavit, February 22, 2005, ("SA1") at ¶ 32; BR2 at 16.)  In addition, Defendant considers feedback from customers and dealers via weekly reports and a toll-free telephone number.  (RO1 at 70-3, 71-3.) Defendant also performs in-house laboratory tests and examinations of used tires to evaluate performance and durability.  (<u>See</u>, <u>e.g.</u>, SA1 at ¶ 33; BR1 at 15-7, 191-2; RO1 at 24, 95-6, 101-7.)

In the mid-nineties, Defendant's examinations of used tires revealed that the tread of certain LR-E tires was separating, in whole or in part, from the rest of the tire, a condition known as tread/belt detachments. (BR1 at 21, 25.)  Around the same time, Defendant noticed an upward trend in adjustments and other claims in its LR-E tires.  (<u>See</u>, <u>e.g.</u>, BR2 at 16-7, TP at 53-5.) Defendant initiated a comprehensive investigation to determine the cause for the tread/belt detachments and to explore possible solutions.  (<u>See</u>, <u>e.g.</u>, BR1 at 30-3, 37-9.) Defendant found the addition of a nylon overlay helped to reduce the instances of tread/belt separations and made the tire more durable under certain conditions. (<u>See</u>, <u>e.g.</u>, RO1 at 34; BR2 at 55; TP at 45.)  Sometime

4

in 1998, Defendant made the decision to convert all its LR-E tires to a nylon overlay construction. (RO2 at 10:22:10.)

Between 1999 and 2001, Defendant began to notice and monitor a similar upward trend in adjustments and problems on its LR-D tires. (See, e.g., TP at 12-3.) Defendant did not conduct a separate investigation on the LR-D tires, but instead, relied largely on the previous work that had been done with the LR-E tires. (See, e.g., TP at 71-72.) Because the nylon overlay had been effective in improving the performance of the LR-E tires, Defendant decided in 2001-02 to "follow suit" and convert all LR-D tires to a nylon overlay as well. (TP at 45, 70-1.) Plaintiff's LR-D tire, manufactured in late February or early March of 2002, did not have the overlay.[2]

### III.  DISCUSSION

#### A.  Discovery and trade secrets.

Texas law determines whether information is privileged. See Fed. R. Evid. 501. Texas Rules of Evidence 507 provides that a "person has a privilege . . . to refuse to disclose and to prevent other persons from disclosing a trade secret owned by the person, if the allowance of the privilege will not tend to conceal fraud or otherwise work injustice." Tex. R. Evid. 507. The trade secret

---

[2] Currently, all of Defendant's LR-D tires are equipped with such an overlay. (RO1 at 190.)

privilege seeks to accommodate two competing interests: (1) a party's interest in protecting its proprietary information; and (2) the importance of fair adjudication of lawsuits. <u>In re Continental Tire, Inc.</u>, 979 S.W.2d 609, 612 (Tex. 1998).

The party resisting discovery bears the initial burden of proving that information is a trade secret. <u>Id</u>. at 613. Generally, a trade secret is defined as "any formula, pattern, device, or compilation of information which is used in one's business and presents an opportunity to obtain an advantage over competitors who do not know or use it." <u>In re Bass</u>, 113 S.W.3d 735, 739 (Tex. 2003); <u>Computer Assocs. Intern. v. Altai</u>, 918 S.W.2d 453, 455 (Tex. 1994). To determine whether a trade secret exists, a court must apply a six-factor test. <u>Bass</u>, 113 S.W.3d at 739. Whether or not something is a trade secret will depend upon:

> (1) the extent to which the information is known outside of his business; (2) the extent to which it is known by employees and others involved in his business; (3) the extent of the measures taken by him to guard the secrecy of the information; (4) the value of the information to him and to his competitors; (5) the amount of effort or money expended by him in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

<u>Id</u>. (quoting the Restatement of Torts § 757 comment B (1939)). These factors constitute a non-exclusive list, and a court must balance the factors in light of the surrounding circumstances. <u>Id</u>. The party claiming a trade secret is not required to satisfy all six factors because trade secrets may not always fit neatly into

each factor. Id. at 740.

If the party resisting discovery meets its burden of establishing the privilege, the burden then shifts to the requesting party to show that "the information is necessary for a fair adjudication of its claims." Continental, 979 S.W.2d at 613. This standard requires more than a mere showing that the information sought is relevant, and there must be something more than general assertions of unfairness. Id. at 613-4; In re Bridgestone/Firestone, Inc., 106 S.W.3d 730, 732 (Tex. 2003). Rather, the requesting party must demonstrate with some specificity how the lack of information will "impair presentation of the case on the merits" to the extent that there is a real threat of an unjust result. Bridgestone/Firestone, 106 S.W.3d at 733. This standard does not require, however, that the information requested be so essential that the requesting party cannot prevail without it. Id. at 732. The Texas Supreme Court has noted, "[i]t may be theoretically possible for a party to prevail without access to trade secret information and yet be unfair to put him to much weaker proof without the information." Id. In each case, the trial court must "weigh the degree of the requesting party's need for the information with the potential harm of disclosure to the resisting party." Continental, 979 S.W.2d at 613.

**B. Analysis of trade secrets privilege in this case.**

The key consideration in determining the applicability of the

trade secret privilege is secrecy.   _Guy Carpenter & Co., Inc. v. Provenzale_, 334 F.3d 459, 467 (5th Cir. 2003).   Texas courts have noted that:

> To be a trade secret absolute secrecy is not required; however, the trade secret must not be generally known to or used by the industry or a matter completely disclosed or ascertainable at a glance.   A trade secret is not a trade secret if the owner of the trade secret fails to take reasonable steps to protect his trade secret. However, the owner of the trade secret is not required to take extraordinary measures to protect his trade secret.

_Stewart & Stevenson Services, Inc. v. Serv-Tech, Inc._, 879 S.W.2d 89, 111 (Tex. App.--Houston 1994).   Thus, information that is "readily ascertainable" will not be entitled to trade secret protection.   _See_, _e.g._, _Guy Carpenter_, 334 F.3d at 467.

The first factor in the trade secret test is the extent to which the information is known outside of the business.   Goodyear has presented evidence that information on tire performance and design changes are not known outside Goodyear and are restricted to a small group of people within the company. (SA1 at ¶ 21.)   In addition, the testing, engineering, and quality control information that go into particular design changes are not disclosed or released to people outside the company. (_See_, _e.g._, SA1 at ¶ 19.) Adjustment and claims data are likewise kept confidential. (SA1 at ¶¶ 30-32.)   The fact that the information at issue in this case is not available outside the company supports a finding of privilege.

The second and third factors of the trade secret test concern

the extent to which the information is known by employees and
others involved in the business and the extent of the measures
taken to guard the secrecy of the information.  Here, Defendant's
designs, engineering findings and procedures, test protocols and
findings, manufacturing processes, and quality assurance systems
are not published and are maintained within the company as
confidential information.  (SA1 at ¶ 19.)  This information is
available to employees within the company on a "need to know" basis
only.  (SA1 at ¶ 13, 22, 26.)  Employees have limited access to the
company's computer system depending on their position and must
agree not to disclose their passwords to others.  (SA1 at ¶¶ 14,
22.)  Access to Defendant's buildings and plants is likewise
restricted, and managers and employees who do not work in a
particular plant cannot enter without prior written approval. (SA1
at ¶¶ 13, 15.)  Considering these  protective measures, the Court
finds that the second and third factors of the trade secret test
weigh in favor of the privilege.  See Bass, supra, 113 S.W.3d at
742 (security cards support privilege).

       The fourth factor of the trade secret test is the value of the
information to the business and its competitors.  There is no
dispute that the information related to the nylon overlay decision
is valuable to the Defendant.  The adjustment and claims data,
quality assurance information, and testing results that led to
Defendant's nylon overlay decision are valuable because they give

the company insight into the performance of its tires and the areas in which improvements are needed.  (SA1 at ¶¶ 28-30, 32.)

The fifth factor of the trade secret test concerns the amount of effort or money expended in developing the allegedly-privileged information.  Defendant claims that it spends "millions of dollars each year" on research and development of tire designs and modifications such as the nylon overlay.  (SA1 at ¶ 23.)  It also argues that the control procedures and adjustment data it uses represent years of investment at significant cost. (SA1 at ¶ 28.)

It is unlikely that Defendant spends a significant amount of money to "develop" adjustment and claims data.  That information is merely collected and maintained in a format named "Universal Adjustment System," and updated.  However, it is undisputed that the implementation of the nylon overlap was the result of Defendant's multi-year investigation into tread/belt detachments on its LR-E tires, and that such investigation was costly.

The sixth and final factor of the trade secret test is the ease or difficulty with which the information could be properly acquired or duplicated by others.  Although some testing could be duplicated, only Defendant could provide Plaintiff with all the information it relied on in making its nylon overlay decisions, such as its internal reports, correspondences, and meetings notes. (See, e.g., SA1 at ¶¶ 5, 9, 19, 20.)

Having considered the six factors of the trade secrets test,

10

it is evident that the information related to Defendant's decision to implement nylon overlays is a trade secret and as such, is privileged.

## C.   Plaintiff's burden.

Finding that the information is privileged, the burden shifts to Plaintiff to demonstrate that the information sought is "necessary for a fair adjudication" of his claims.   In re Bridgestone/Firestone, Inc., 106 S.W.3d 730, 735 (Tex. 2003).   The relationship between the trade secret information sought and the material elements of the parties' claims and defenses must be examined.   Id.   Generally, trade secret information is discoverable "when not allowing discovery would significantly impair a party's ability to establish or rebut a material element of a claim."   Id. at 736.

Here, Plaintiff has raised negligence and products liability claims.   To state a claim for negligence under Texas law, a plaintiff must prove (1) a legal duty; (2) a breach of that duty; and (3) damages proximately resulting from the breach.   Praesel v. Johnson, 967 S.W.2d 391, 394 (Tex. 1998).   In this case, Plaintiff must be able to show the jury that the Defendant knew of a problem with the LR-D tires and should have taken preventative measures to add the nylon overlay sooner than it did.

Plaintiff's products liability claim is governed by § 402A of the Restatement (Second) of Torts.   Firestone Steel Prods. Co. v.

<u>Barajas</u>, 927 S.W.2d 608, 613 (Tex. 1996).  Section 402A provides that "one who sells any product in a defective condition unreasonably dangerous to the user . . . is subject to liability." Restatement (Second) of Torts § 402A.  A product may be unreasonably dangerous because of a defect in design.  <u>Caterpillar, Inc. v. Shears</u>, 911 S.W.2d 379, 382 (Tex. 1995).  In determining whether a product is unreasonably dangerous as designed, the jury must balance the utility of the product with the risk involved in its use.  <u>American Tobacco Co., Inc. v. Grinnell</u>, 951 S.W.2d 420, 432 (Tex. 1997).  In so doing, the jury may consider: (1) the gravity and likelihood of injury from the product's use; (2) the availability of a substitute product which would meet the same need and not be unsafe or unreasonably expensive; and (3) the manufacturer's ability to eliminate the unsafe character of the product without seriously impairing its usefulness.  <u>Id</u>.; <u>see also Caterpillar, Inc.</u>, 911 S.W.2d at 384.

To prevail on his products liability claim, Plaintiff must demonstrate that the LR-D tire on his truck was unreasonably dangerous.  Plaintiff must present evidence that the tire posed a serious and likely risk of harm and that a safer, cost-effective, alternative design was available to the Defendant.

Plaintiff's negligence claims and products liability claims each include elements addressing risk of harm and the burden of reducing that risk.  As such, Plaintiff needs access to the trade

12

secret information at issue if he is to meet his burdens at trial. For example, Plaintiff would need the adjustment data and damage claims that reflect the upward trend in tread/belt detachments in Defendant's LR-D and LR-E tires.  Similarly, Plaintiff needs the testing and research data that reflect what Goodyear should have known about possible causes of, and solutions to, the tread/belt detachment problem.  Plaintiff needs the design and production information reflecting the ease or difficulty with which a nylon overlay could have been incorporated into Defendant's tire lines. This information goes directly to the issues of risk and burden, which are essential elements of Plaintiff's claims.

Similarly, Plaintiff is also entitled to Defendant's meeting minutes, internal communications, power-point presentations, and other aspects of its internal decision-making process related to the decision to convert its LR-D and LR-E tires to a nylon overlay to evaluate whether Goodyear conducted a reasonable investigation of the potential problems with its tires, relied on appropriate information, and interpreted the available data in a reasonable manner.  The failure to conduct a reasonable investigation is one potential basis on which Plaintiff might seek to hold Defendant liable.  See, e.g., Restatement (Second) of Torts § 300 & comment (c) (stating that negligence may also include a failure to make "such inspection as a reasonable man would recognize as necessary to ascertain whether [a product] is in a condition fit for use").

**D.   Defendant's objections.**

Defendant argues that Plaintiff does not need the requested information because Goodyear has conceded that: (1) nylon overlays were technologically feasible at the time Plaintiff's LR-D tire was manufactured; (2) economics did not play a part in the nylon overlay decision; and (3) Goodyear understood that an overlay might reduce tread/belt detachments in its tires.[3]   However, Defendant cannot escape discovery by admitting feasibility, because a jury is entitled to hear evidence on the extent to which the nylon overlay was a feasible alternative and/or a safer design.   See e.g., Boatland of Houston, Inc. v. Bailey, 609 S.W.2d 743, 746 (Tex. 1980) ("[F]easibility is a relative, not an absolute, concept; the more scientifically and economically feasible the alternative was, the more likely that a jury may find that the product was defectively designed").   Moreover, Plaintiff is entitled to have his own experts look at Defendant's documents and judge the feasibility, benefits, and burdens of implementing a nylon overlay. Plaintiff's analysis on these issues might differ significantly from Defendant's analysis.

Defendant opposes Plaintiff's access to the adjustment data for all LR-D and LR-E tires arguing that Plaintiff has the information relating to how his particular LR-D tire, the Wrangler

---

[3] (See, e.g., RO2 at 12:01:18; September 15, 2005, Hearing at 4:09:30, 4:17:30.)

LR-D, performed both before and after the implementation of an overlay. Defendant has provided Plaintiff with certain adjustment data summarizing how many Wrangler LR-D tires were produced and Defendant's estimation of the percentage of those tires that experienced some kind of failure. (<u>See</u> Pl.'s Ex 11 at 1-5.) Defendant argues that any information beyond the data on Plaintiff's Wrangler LR-D tire is overly broad and unnecessary for a fair adjudication.

Defendant's adjustment data for the Wrangler LR-D tire by year/quarter provides (1) the number of tires produced; (2) the estimated number of tires that were adjusted; and (3) the estimated percentage of tires produced that period that were adjusted. (Pl.'s Ex. 11 at 1-5.) For example, in the third quarter of 1999, the data reads:

| Prod. Date | # Produced | Est. # Adj'd | Est. % to Prod. |
|------------|------------|--------------|-----------------|
| 1999, Q3   | 5684       | 48           | 0.84%           |

The first two columns of information are self-explanatory. The fourth column (Est. % to Prod.) is created by dividing the number in the third column (Est. # Adj'd) by the number in the second column (# produced). (RO2 at 11:08:38.) Defendant contends that this estimated percentage is a "standard way in the industry" of looking at adjustment data. (RO2 at 11:09:20.)

At the September 15 hearing, Defendant explained that it

derives the number in the third column by estimating the number of tires adjusted for a given period.  Goodyear uses a "sampling process" to reach this number.  (RO2 at 11:09:56.)  When a retailer or dealer adjusts a tire, they record a certain code indicating the alleged problem with the tire.  Defendant does not rely on the retailers' problem-codes because it believes that they are often inaccurate.  (RO2 at 11:09:58.)  In particular, Defendant is skeptical of the retailers' problem-codes because there is no set standard to guide the coding of adjusted tires, and  every retailer will not code tires in the same way.  (RO2 at 11:11:05.)  Instead, Goodyear asks the retailers to send in a "small sample" of those tires to the company for its own technicians to examine and "code them as [Goodyear] understand[s] they should be coded."  (RO2 at 11:10:08, 11:24:56.)

The number of tires Defendant requests for inspection is "different for different situations, different codes, [but] typically 20 to 40 percent of the tires that are adjusted are requested."  (RO2 at 11:16:55.)  The dealers and retailers, however, may not actually send Goodyear every tire requested.  (See RO2 at 11:17:10.)  In fact, many of the dealers may not keep the adjusted tires.[4]  Therefore, even if Defendant requests 20% of

---

[4] At the hearing, the following exchange took place:
**COURT:**     How many of those that are requested actually show up?
**WITNESS:**   Well, that's another issue we have, sometimes –
**COURT:**     Because, I mean . . . they throw those out at all those

adjusted tires from its retailers it may not receive 20% of tires for inspection.  In any case, Goodyear examines those tires it does receive and determines what percentage of that sample it believes were correctly coded by the retailer as having a particular problem.  (RO2 at 11:10:30.)  As explained by Defendant's representative:

> if we brought back ten [adjusted tires] and, of those ten, two of them, or four of them, actually had a crown-area issue with them, we would use that percentage.  So, that's why we use the term.  The estimated number adjusted is based upon the percentage that our technicians examine rather than the point of sale.

(RO2 at 11:11:49-11:12:12.)  For example, there could have been 1000 tires adjusted by retailers in the third quarter of 1999; but if Defendant found that only 5% of its sample were *correctly* adjusted, then Goodyear would estimate the "true" number of adjusted tires to be about 50 (or 5% of 1000).

Defendant's representative could not provide the Court with the numbers on which the company's estimation is actually based, such as: (1) the total number of tires coded for various problems by retailers and dealers across the country; (2) the number of those tires Goodyear requested for inspection; or (3) the number of those tires that actually made it to Goodyear for inspection. Defendant's representative testified first that such "information

---

       tire places.
**WITNESS**:  Right.
(RO2 at 11:17:06.)

probably doesn't exist," but later stated that he believed "in the database are those numbers." (RO2 at 11:14:22, 11:18:53.) Without the underlying data, Plaintiff has no way of determining whether Defendant's estimations are accurate and reliable, because there is no evidence on the population and sample size from which those estimates are drawn.

Moreover, the underlying data itself is necessary for a fair adjudication of Plaintiff's negligence claim.  An issue at trial will be whether Defendant was on notice of a risk of harm from the Wrangler LR-D tire.  Defendant has several times argued that it was not on notice of any danger because its adjustment estimations on the Wrangler LR-D tire do not indicate the existence of any problem with the tire.  (See, e.g., RO2 at 11:13:15, 11:30:35; TP at 78-84.)  Plaintiff will need the underlying data to effectively cross-examine Defendant's witnesses.

Further, a jury might consider the similarities among Defendant's various LR-D and LR-E tires and conclude that the existence of a problem with the other tires should have put Defendant on notice of a potentially dangerous situation with the Wrangler LR-D tire.  The Fifth Circuit noted:

> Evidence of similar accidents involving similarly designed products goes to the reasonableness of putting such a product on the market. [A party] should be allowed to show, if she can, that products similar in all relevant respects to appellees' have a long history of unacceptable accident rates, and that [defendants] were well aware of this situation at the time they made the

18

particular products at issue here.  Such evidence, if
believed by the jury, would, in conjunction with evidence
of safer alternatives, tend to show the unreasonableness
of putting [defendants'] products on the market.

Jackson v. Firestone Tire & Rubber Co., 788 F.2d 1070, 1077 (5th

Cir. 1986) (applying Texas law and citing Bell Helicopter Co. v.

Bradshaw, 594 S.W.2d 519 (Tex. Civ. App. 1979)).  Thus, the testing

data from the other LR-D and LR-E tires is relevant to the issue of

risk.  See Id. at 1080 (stating that evidence on products other

than the exact one involved in the lawsuit shows, among other

things, "the magnitude of the difference in safety when the two

designs [are] compared").[5]

     Defendant's attempt to limit discovery to the information on

the Wrangler LR-D tire is unpersuasive because it is undisputed

that Goodyear did not limit itself to the Wrangler LR-D data in

making its decision to equip the tire with an overlay.  (See, e.g.,

RO2 at 11:38:25.)  Rather, Defendant acknowledged that it compares

information on tires within, and across, particular tire lines.

(RO1 at 189-90; BR1 at 12.)  Similarly, Goodyear also compares data

on different tires within the class of light truck tires as a

whole.  (BR1 at 12.)  In fact, the decision to convert the Wrangler

_____

     [5] Defendant argues that evidence on tires other than the Wrangler
LR-D tire is not necessary for a fair adjudication because of the
dissimilarities between it and other LR-D and LR-E tires, including:
inflation pressure, carrying capacity, and size.  (See, e.g., SA2 at
¶¶ 6-10.)  However, any differences in the tires, and data related to
them, "go merely to the weight to be given the evidence" and not to
their discoverability.  See Jackson, 788 F.2d at 1083.

LR-D tire, as well as all LR-D tires, to a nylon overlay was based substantially on Defendant's previous investigation and conversion of LR-E tires. Goodyear's representatives frequently characterized the decision to implement a nylon overlay on the LR-D tires as "following suit" based on Defendant's background and experience with the LR-E tires. (See TP at 45, 71, 72, 76.) The fact that Defendant looked beyond the specific Wrangler LR-D tire data in making its decision to add a nylon overlay underscores Plaintiff's need for the data.

Finally, the Court finds that the potential harm from disclosure is limited in this case, in part, due to the previously entered protected order. See D.E. 34. See also Continental Tire, 979 S.W.2d at 614 (court may consider strengths and weaknesses of protective order in place).

The March 7, 2005 protective order includes safeguards regarding the use and dissemination of Defendant's trade secrets. The protective order prohibits Plaintiff and others from using confidential documents for any purpose except the present litigation. (Protective Order ("PO") § II, 1.) The Plaintiff may not communicate (a term broadly defined) confidential information to anyone except for a "covered person." (PO § II, 2.) A "covered person" is narrowly defined as the Court, a party and his counsel, and any of counsel's employees who need to see the protected documents. (PO § II, 2.) Plaintiff may also show protected

documents to retained experts, but only in hard-copy form and not in any electronic or computer-readable format.  (PO § II, 2(d).) Third-parties receiving confidential information must sign a written acknowledgment stating that he or she is familiar with the terms of the protective order, agrees to its terms, and subjects his or her self to the jurisdiction of the Court for the purposes of enforcement.  (PO § II, 6.)

The protection of confidential documents continues through trial and appeal.  (See PO § II, 12, 13, 14.)  The Court will act as gatekeeper for the documents in its custody and will not release any confidential documents to litigants in another case without a showing that they have met their burden and complied with the procedures set forth in the protective order.  (PO § II, 2(e).) Finally, the protective order addresses the possibility of inadvertent disclosure by providing that: (1) inadvertent disclosures shall not waive any privilege; and (2) that any party who accidentally receives confidential documents must, upon receiving notice of the error, destroy the documents and certify that he or she has done so.  (PO § II, 11.)  These protections significantly diminish any risk of harm to Defendant in this case.

To assuage any additional fears Defendant might have, the Court orders that Plaintiff's counsel shall not disclose the protected information to any expert witness until Defendant is given notice of the expert and the Court has ruled on the

admissibility of that expert under <u>Daubert v. Merrill Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579 (1993).

The potential harm from disclosure of the privileged information at issue does not outweigh Plaintiff's need for the information to properly prosecute his claims. Plaintiff has met his burden of overcoming the trade secret privilege.

## IV.   CONCLUSION

For the reasons stated above, Plaintiff's oral Motion for access to certain information is GRANTED. Defendant is hereby ORDERED to produce to Plaintiff, by Friday, December 9, 2005, all documents related to the decision to equip its Load Range D and Load Range E tires with a nylon overlay. Plaintiff's counsel shall not disclose the information produced under this Order to any expert witness until Defendant is given notice of the expert and the Court has ruled on the admissibility of that expert. The deadline for designating tire experts is reset for December 16, 2005.

SIGNED and ENTERED this 5th day of December, 2005.

_____
Janis Graham Jack
United States District Judge

22